**UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

---

**DESTINY MORGEN MARIE WORDEN,**
an individual,

Plaintiff,

Hon. ________________________
Case No. ________________________

v.

**CINEMA THEATRE OF KALAMAZOO, INC.,**
**d/b/a DEJA VU SHOWGIRLS KALAMAZOO,**
a Michigan domestic profit corporation;
**DEJA VU SERVICES, INC.,**
a Michigan corporation;
**CARLOS FERNANDEZ, individually; and**
**JOHN DOE, individually,**

jointly and severally,

Defendants.

---

**AVANTI LAW GROUP, PLLC**
Robert Anthony Alvarez (P66954)
Juan Antonio Salazar-Aguero (86234)
Attorneys for Plaintiff
600 28th St. SW, Wyoming, MI 49509
(616) 257-6807
ralvarez@avantilaw.com | asalazar@avantilaw.com

---

## COMPLAINT AND JURY DEMAND

Plaintiff, Destiny Morgen Marie Worden, by and through her attorneys, Avanti Law Group, PLLC, states the following for her Complaint against Defendants:

## INTRODUCTION

1. This is an action for unpaid minimum wages, sex discrimination, retaliation, and, in the alternative, breach of contract, arising from Defendants' operation of an adult-entertainment club in Kalamazoo, Michigan.

2. Plaintiff Destiny Morgen Marie Worden worked at Defendants' club as an exotic dancer and entertainer from on or about June 28, 2023, until on or about October 11, 2024.

3. Defendants classified Plaintiff as an "independent contractor" and "Independent Professional Entertainer." That classification did not reflect the economic reality of the relationship.

4. Defendants paid Plaintiff no wages. Although Defendants' written agreements stated that Plaintiff would choose her own days and times, Defendants, in practice, required her to remain for a required period each shift, required her to clock in and out by fingerprint, fixed the prices charged to customers, required stage rotation, collected all customer payments and held them until the end of her shift, and charged rent that increased as her time on the premises decreased.

5. Defendants did not pay Plaintiff wages free and clear of these charges and did not ensure that Plaintiff received at least the applicable minimum wage for all hours worked.

6. On or about October 11, 2024, a patron sexually assaulted Plaintiff while she was working. When Plaintiff reported the assault to Defendants' manager and said she wanted to involve law enforcement, the manager told her she could not call the police, called her unprofessional, and directed her to return to the stage.

7. After Plaintiff returned to the stage, the patron who had assaulted her booed her from across the room. When Plaintiff told the manager she wanted to leave, Defendants

required her to pay approximately $125, the money she had earned that night, as a condition of leaving before her required time. Plaintiff paid it and left. She was then removed from the workers' communication group, and her work at the club ended.

8. Plaintiff brings claims under the Fair Labor Standards Act, the Michigan Improved Workforce Opportunity Wage Act, and the Elliott-Larsen Civil Rights Act, together with a claim for breach of contract pled in the alternative, and seeks unpaid wages, liquidated damages, compensatory damages, attorney fees, costs, and interest.

**PARTIES**

9. Plaintiff Destiny Morgen Marie Worden is an individual residing in Kent County, Michigan.

10. Defendant Cinema Theatre of Kalamazoo, Inc. is a Michigan domestic profit corporation that does business as Deja Vu Showgirls Kalamazoo and that operated, owned, managed, or controlled the adult-entertainment club located at 1336 Ravine Road, Kalamazoo, Michigan 49004.

11. Defendant Deja Vu Services, Inc. is, upon information and belief, a Michigan corporation that participated in, controlled, directed, or benefited from the employment, wage, contract, and management practices used at the club. The Model Release Defendants required Plaintiff to sign names Deja Vu Services, Inc. among the designated assignees, transferees, licensees, and successors of Cinema Theatre of Kalamazoo, Inc. with respect to entertainers' image rights, and Defendants' complaint-information sheet directed entertainers who believed they had been sexually harassed to contact a “Company Attorney” hotline rather than club management.

12. Defendant Carlos Fernandez ("Carlos") was, at all relevant times, a manager or assistant manager of the club who acted directly or indirectly in the corporate Defendants' interest and exercised authority over Plaintiff's work, pay, and continued engagement.

13. Defendant John Doe was, at all relevant times, an owner, officer, or person with operational and financial control over Cinema Theatre of Kalamazoo, Inc. and the club.

14. At all relevant times, Defendants acted individually, jointly, and as joint employers, and Defendants' managers, agents, and representatives acted within the scope of their actual, apparent, or delegated authority.

## JURISDICTION AND VENUE

15. This Court has subject-matter jurisdiction over Plaintiff's federal claim under 28 U.S.C. § 1331 because it arises under the Fair Labor Standards Act, 29 U.S.C. § 201 et seq.

16. This Court has supplemental jurisdiction over Plaintiff's Michigan-law claims under 28 U.S.C. § 1367 because they arise from the same case or controversy as Plaintiff's federal claim.

17. Venue is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiff's claims occurred in Kalamazoo County, which lies within the Western District of Michigan, Southern Division.

18. At all relevant times, Defendants constituted an enterprise engaged in commerce or in the production of goods for commerce within the meaning of 29 U.S.C. § 203(s)(1)(A): Defendants had employees who handled, sold, or otherwise worked on goods or materials that had moved in or were produced for interstate commerce, including alcohol, food, and

point-of-sale and card-processing equipment, and, upon information and belief, had an annual gross volume of sales made or business done of not less than $500,000.

19. Defendants' operations had a connection to interstate commerce, including the service of customers from outside Michigan, the processing of credit- and debit-card transactions, including the sale of card-purchased club scrip, and the sale of goods and alcohol that had moved in interstate commerce.

20. Plaintiff's claims in this case relate to a sexual assault dispute and a sexual harassment dispute within the meaning of 9 U.S.C. § 401. The dispute arose on or about October 11, 2024, after March 3, 2022.

21. Pursuant to 9 U.S.C. § 402(a), Plaintiff elects that no predispute arbitration agreement and no predispute joint-action waiver, including Sections 22 and 23 of the Dancer Performance Lease, is valid or enforceable with respect to this case.

22. Under 9 U.S.C. § 402(b), whether chapter 4 of title 9 applies, and the validity and enforceability of any agreement to which it applies, are determined by this Court rather than an arbitrator. Section 22 of the Dancer Performance Lease itself states that 9 U.S.C. §§ 401–402 bar compelled arbitration of certain specified disputes and that “THIS SECTION 22 DOES NOT GOVERN THE RESOLUTION OF SUCH DISPUTES.”

## GENERAL FACTUAL ALLEGATIONS

23. Plaintiff began working at the club on or about June 28, 2023, and worked there until on or about October 11, 2024.

24. Defendants required Plaintiff to sign written agreements characterizing her as an “Independent Professional Entertainer,” including a Dancer Performance Lease dated

September 29, 2024, with an attached schedule of prices and rent (Exhibit A); a "Business Status Selection by Entertainer and Enhanced Offer of Employment"; and an "Entertainer Assessment Form." Defendants required Plaintiff to sign earlier versions of their agreements during her tenure.

25. Defendants' manager, Holly Johnson, is identified on the Entertainer Assessment Form as the interviewer and assessor. Defendants' manager completed the form and marked every item. Plaintiff did not fill out the form; she initialed and signed it where she was directed to sign.

26. Defendants' own documents contradict the independent-contractor label and one another:

27. Section 11 of the Lease and paragraph 3 of the Business Status Selection document state that an Independent Professional Entertainer is not required to share tips with, or "tip out" to, anyone. In practice, Defendants required Plaintiff to tip out house staff each shift, as alleged below.

28. Section 7 of the Lease states that the Club has no right to direct or control the manner or means of an entertainer's services, except as provided in Sections 2(A), 3(A), and 6. Section 3(A) requires entertainers to participate in stage rotation "in order to ensure a continuous entertainment presentation on the Premises," and Section 11 provides that the Club sets fixed prices that entertainers may not vary.

29. Section 14 of the Lease and paragraph 7 of the Business Status Selection document state that the entertainer determines the days and times she performs. Exhibit A to the Lease, however, charges rent that increases sharply as the time the entertainer spends on the

premises decreases, and Defendants charged Plaintiff a fee to leave before her required time.

30. Defendants required Plaintiff to clock in and out using a fingerprint scanner. Section 16 of the Lease provides for Defendants' capture of entertainers' biometric data, including fingerprints.

31. In practice, Defendants required Plaintiff to remain on the premises for a required period each shift and charged her a fee to leave before that time. Plaintiff typically worked approximately six to seven hours per shift, on Wednesdays and Thursdays and on alternating Fridays, Saturdays, and Sundays.

32. For every shift, Defendants charged Plaintiff rent under Exhibit A to the Lease: $80 if she was on the premises six hours or more, increasing by $40 for each hour less, to $280 if she was on the premises less than two hours. The rent was reduced by half if she participated in all of her stage rotation performances. Under Section 15 of the Lease, rent was due immediately at the end of each shift.

33. Section 3(A) of the Lease required Plaintiff to participate in stage rotation to ensure a continuous entertainment presentation on the premises. Defendants imposed fines, typically about $50, for missed stage sets or roll call.

34. Because Plaintiff had to remain available for stage rotation, roll call, and customers, she could not freely take breaks.

35. Defendants fixed the prices charged to customers for dances, VIP-room performances, and other services, and Section 11 of the Lease prohibited dancers from charging a customer a different price. Exhibit A set those prices.

36. Of each price set in Exhibit A, Defendants kept a fixed “Equipment Charge” or “Room Charge,” which Section 11 of the Lease declares to be “the exclusive property and income of the Club.” For example, Defendants kept $15 of each $40 single dance and $80 of each $205 fifteen-minute VIP performance.

37. Defendants controlled whether Plaintiff could continue working at the club and maintained the power to discipline her through fees, penalties, removal from the schedule, removal from the premises, or termination.

38. Customers paid for dances and performances through Defendants' payment system. Plaintiff received receipts or club scrip, including scrip the club referred to as “Vu Cash,” reflecting those payments.

39. Under the parties' agreement, a designated club employee collected all entertainment fees from customers, and Defendants held those fees until the end of the dancer's shift before distributing them to her.

40. Defendants paid Plaintiff no wages. Section 12(B) of the Lease states: “ENTERTAINER UNDERSTANDS THAT THE CLUB WILL NOT PROVIDE TO HER ANY WAGES (WHETHER HOURLY OR OTHERWISE).” Defendants' Business Status Selection document likewise states that an Independent Professional Entertainer “WILL NOT RECEIVE AN HOURLY WAGE OR A SALARY.”

41. At the end of each shift, Defendants processed Plaintiff's receipts or scrip and paid her in cash, after deducting or requiring payment of rent, early-leave charges, fines, and other amounts.

42. Defendants required Plaintiff to tip the disc jockey each shift, typically at least $15 to $20 and at times $70 to $100, and expected her to tip other house staff, including hosts and security.

43. In every workweek, Defendants paid Plaintiff no wages for her hours worked, and Plaintiff paid Defendants rent, fees, and fines and paid required tip-outs.

44. On or about October 11, 2024, while Plaintiff was working, a patron, later identified as Zeth Michael Barton, sexually assaulted her in a private dance room. He put his mouth on her breast and, after she refused his request for sexual contact, grabbed her and sexually assaulted her.

45. Plaintiff immediately reported the assault to Defendants' manager, Carlos.

46. Carlos told Plaintiff that she was not allowed to call the police and that she was being unprofessional.

47. Rather than remove the patron, secure the area, or assist Plaintiff, Defendants directed Plaintiff to return to the stage, telling her, in words or substance, to "shake it off."

48. Plaintiff returned to the stage.

49. While Plaintiff was on stage, the same patron who had assaulted her booed and jeered at her from across the room.

50. Plaintiff left the stage and told Carlos that she wanted to leave. Defendants told her that, to leave before her required time, she had to pay approximately $125, which was the money she had earned that night. Plaintiff turned over that money and left the club.

51. When law-enforcement officers responded, Carlos told them that he had not yet asked the patron to leave. Defendants were able to identify the patron through the scanning device

the club's doorman used to admit patrons, a device the club used to flag individuals who had previously caused problems.

52. After the incident, Plaintiff was removed from the workers' communication group and received no termination notice.

53. Plaintiff did not perform at the club after October 11, 2024, and her work relationship with Defendants ended following the assault and her report. In the alternative, Defendants' response to her report, including returning her to the stage while her assailant remained on the premises, charging her to leave, and removing her from the workers' communication group, would have compelled a reasonable person in Plaintiff's position to stop working at the club.

54. By letter dated March 28, 2025, the Kalamazoo County Prosecuting Attorney's Office notified Plaintiff that it had charged Zeth Michael Barton with one count of criminal sexual conduct in the fourth degree (force or coercion) in People v. Barton, No. 25-00295, and addressed Plaintiff as the victim of that crime.

55. Defendants operated a club in which dancers worked in close physical proximity to patrons, including in private and semi-private rooms where alcohol was served.

56. Through the door-scanning system described above, Defendants had the means to identify the patron and to remove him from the premises.

57. After Plaintiff reported the assault, Defendants failed to take prompt and appropriate remedial action. Defendants instead forbade Plaintiff from calling the police, returned her to work while her assailant remained on the premises, had not asked her assailant to leave by the time officers arrived, charged her to leave, and ended her engagement.

58. In 2016, entertainers filed a class and collective action in the United States District Court for the Eastern District of Michigan asserting that entertainers at an affiliated club had been misclassified as non-employees or "independent contractors" and that Deja Vu Services, Inc. was their joint employer. Jane Doe 1 v. Deja Vu Services, Inc., No. 2:16-cv-10877 (E.D. Mich.).

59. The Release and Settlement Agreement filed in that case on February 2, 2017 (ECF No. 29-2) includes, in its list of clubs, "Cinema Theatre of Kalamazoo Inc," doing business as "Déjà Vu Showgirls" at 1336 Ravine Road, Kalamazoo, and provides for an "Entertainer Assessment Form" to be used by club management to determine whether an entertainer qualifies to perform as a "bona fide IPE."

60. Defendants' Business Status Selection document refers to that Assessment as a process and questionnaire "approved by a federal court," and describes the tip-credit and minimum-wage requirements of Section 203(m) of the Fair Labor Standards Act.

61. On October 11, 2023, while Plaintiff was working at the club, a former worker filed a collective-action complaint in this Court against Cinema Theatre of Kalamazoo, Inc. and D V Kalamazoo, LLC under 29 U.S.C. § 206, alleging that the defendants misclassified workers at 1336 Ravine Road as "independent contractors" and required them to pay kickbacks. Doe v. D V Kalamazoo, LLC, No. 1:23-cv-01081 (W.D. Mich.). That case was stayed for arbitration on December 18, 2023, and voluntarily dismissed on August 1, 2024.

62. After being sued in October 2023, Defendants continued to classify Plaintiff as an independent contractor, to pay her no wages, and to charge her rent, fees, and fines through the end of her work at the club.

63. As a direct and proximate result of Defendants' conduct, Plaintiff sustained lost and unpaid wages, the loss of the earnings Defendants retained, emotional distress, humiliation, anxiety, and mental anguish, and incurred or will incur related expenses.

**COUNT I**
**VIOLATION OF THE FAIR LABOR STANDARDS ACT**
**MISCLASSIFICATION AND FAILURE TO PAY MINIMUM WAGE**
**29 U.S.C. § 201 et seq.**

64. Plaintiff incorporates the preceding paragraphs as if fully restated.

65. At all relevant times, Defendants were "employers" and Plaintiff was an "employee" within the meaning of 29 U.S.C. § 203. Defendants Carlos Fernandez and John Doe were "employers" under 29 U.S.C. § 203(d) because they acted directly or indirectly in the interest of the corporate Defendants with respect to Plaintiff.

66. Plaintiff was economically dependent on Defendants. As alleged above, Defendants controlled the conditions of her work, timekeeping, required shift time, stage rotation, customer pricing, the collection and payout of earnings, rent, fees, and discipline, and Plaintiff had no meaningful opportunity for profit or loss based on her own managerial skill or investment.

67. Plaintiff's classification as an independent contractor did not reflect the economic reality of the relationship. Rights under the Fair Labor Standards Act may not be waived by private agreement, and Defendants' contractual labels do not defeat coverage.

68. No exemption applies. In each workweek, Defendants paid Plaintiff no wages and therefore failed to pay her at least the federal minimum wage of $7.25 per hour for all hours worked, in violation of 29 U.S.C. § 206.

69. Defendants required Plaintiff to pay rent, fees, penalties, and tip-outs out of her earnings for Defendants' benefit. Wages are not paid “free and clear” where the employee kicks back, directly or indirectly, all or part of the wage to the employer or for the employer's benefit, 29 C.F.R. § 531.35. Defendants' rent and fee schedule operated as such a kickback.

70. The entertainment fees customers paid for Plaintiff's performances were not wages paid by Defendants. Section 11 of the Lease declares that those fees are “the exclusive property and income of the Entertainer.”

71. Defendants' violations were willful within the meaning of 29 U.S.C. § 255(a). Defendants knew of the Act's minimum-wage requirements, as their own Business Status Selection document shows; their club was identified in the 2017 settlement of dancer-misclassification claims described above; and they continued the same pay practices after being sued in this Court in October 2023 for misclassifying workers at the same club.

72. Plaintiff is entitled to unpaid minimum wages, an equal amount in liquidated damages, attorney fees, costs, and interest under 29 U.S.C. § 216(b).

**COUNT II**
**VIOLATION OF THE MICHIGAN IMPROVED WORKFORCE OPPORTUNITY WAGE ACT**
**FAILURE TO PAY MINIMUM WAGE**
**2018 PA 337, as amended by 2018 PA 368, MCL 408.931 et seq.**

73. Plaintiff incorporates the preceding paragraphs as if fully restated.

74. During Plaintiff's employment, Michigan's minimum wage was governed by the Improved Workforce Opportunity Wage Act, 2018 PA 337, as amended by 2018 PA 368, MCL 408.931 et seq. (the "Act").

75. At all relevant times, Plaintiff was an employee, and Defendants were employers, within the meaning of that Act.

76. Defendants failed to pay Plaintiff the applicable Michigan minimum wage, $10.10 per hour in 2023 and $10.33 per hour beginning January 1, 2024, for all hours worked, and imposed rent, fees, fines, and required tip-outs that further reduced her pay. Defendants' own Business Status Selection document stated the applicable full minimum wage as $10.10 per hour.

77. Defendants failed to keep or provide accurate records of the wages owed and paid to Plaintiff.

78. Under MCL 408.939(1)(a), Plaintiff is entitled to recover the difference between the amount paid and the amount that would have been paid under the Act, an equal additional amount as liquidated damages, costs, and reasonable attorney fees, together with interest.

**COUNT III**
**VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT**
**SEX DISCRIMINATION — HOSTILE WORK ENVIRONMENT**
**MCL 37.2101 et seq.**

79. Plaintiff incorporates the preceding paragraphs as if fully restated.

80. Plaintiff is a woman and a member of a protected class under the Elliott-Larsen Civil Rights Act.

81. The Act prohibits discrimination against an individual with respect to employment, compensation, or a term, condition, or privilege of employment because of sex, MCL

37.2202, and reaches a defendant that affects or controls a term, condition, or privilege of the individual's work, whether or not it is her direct employer.

82. Defendants affected and controlled the terms, conditions, and privileges of Plaintiff's work, including her schedule, pay, workplace, and continued engagement.

83. Plaintiff was subjected to unwelcome sexual conduct based on sex, the patron's sexual assault described above, followed by his booing and jeering at her after she returned to the stage, which was sufficiently severe to create an intimidating, hostile, and offensive work environment and to substantially interfere with her work.

84. Plaintiff reported the assault to Defendants' manager, giving Defendants notice of the sexual conduct in their workplace.

85. Defendants failed to take prompt and appropriate remedial action after receiving that notice. Defendants instead forbade Plaintiff from calling the police, told her she was being unprofessional, directed her back to the stage while the assailant remained on the premises, allowed the assailant to remain and to boo her, and charged her approximately $125 to leave the building where she had just been assaulted.

86. Defendants had the means to respond, including a door-scanning system that identified the assailant, and did not use it to remove him or otherwise protect Plaintiff. When officers arrived, Carlos told them that he had not yet asked the patron to leave.

87. As a direct and proximate result of Defendants' violations, Plaintiff suffered lost wages, emotional distress, humiliation, and mental anguish.

88. Plaintiff is entitled to compensatory damages, attorney fees, costs, and interest under the Act.

**COUNT IV**
**VIOLATION OF THE ELLIOTT-LARSEN CIVIL RIGHTS ACT**
**RETALIATION**
**MCL 37.2701**

89. Plaintiff incorporates the preceding paragraphs as if fully restated.

90. Plaintiff engaged in protected activity under the Act when she complained to Defendants' manager about the sexual assault and sex-based misconduct in her workplace and sought to report it to law enforcement.

91. Defendants knew of Plaintiff's protected activity, which she communicated directly to their manager.

92. Defendants took materially adverse action against Plaintiff after her protected activity, forbidding her from calling the police, charging her to leave, removing her from the workers' communication group, and ending her engagement or, in the alternative, constructively discharging her.

93. Plaintiff's protected activity was a significant factor in Defendants' adverse actions, which began immediately after it.

94. As a direct and proximate result of Defendants' retaliation, Plaintiff suffered lost wages, emotional distress, humiliation, and mental anguish.

95. Plaintiff is entitled to compensatory damages, attorney fees, costs, and interest under the Act.

**COUNT V**
**BREACH OF CONTRACT**
**PLED IN THE ALTERNATIVE**

96. Plaintiff incorporates the preceding paragraphs as if fully restated.

97. This count is pled in the alternative to Plaintiff's allegations that she was Defendants' employee.

98. If the parties' relationship was governed by the Dancer Performance Lease, as Defendants contend, the Lease was a binding contract. Section 17 of the Lease provides that the Club materially breaches the Lease "by failing to distribute Entertainment Fees to Entertainer when due." Section 19 permits termination without cause only "upon thirty (30) days' notice to the other Party."

99. Defendants breached the Lease by retaining the entertainment fees Plaintiff earned on October 11, 2024, approximately $125, rather than distributing them to her, and by ending her engagement without the notice Section 19 requires.

100. As a direct and proximate result, Plaintiff sustained damages, including the retained entertainment fees and the income she would have earned during the thirty-day notice period.

101. Plaintiff is entitled to contract damages, interest, and costs.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, jointly and severally where permitted, and award the following relief:

A. Unpaid minimum wages under the Fair Labor Standards Act;

B. An equal amount in liquidated damages under the Fair Labor Standards Act;

C. Unpaid minimum wages, an equal additional amount as liquidated damages, costs, and attorney fees under the Improved Workforce Opportunity Wage Act, MCL 408.939;

D. Compensatory damages under the Elliott-Larsen Civil Rights Act, including emotional-distress damages;

E. In the alternative, contract damages for breach of the Dancer Performance Lease;

F. Economic damages, including lost wages and lost earning capacity;

G. A declaration that Plaintiff was misclassified as an independent contractor;

H. Prejudgment and postjudgment interest;

I. Attorney fees and costs under the FLSA, the Improved Workforce Opportunity Wage Act, the Elliott-Larsen Civil Rights Act, and any other applicable law;

J. Exemplary damages to the extent permitted by Michigan law; and

K. All other relief the Court deems just and equitable.

**JURY DEMAND**

Plaintiff demands a trial by jury on all issues so triable.

Respectfully submitted,

**AVANTI LAW GROUP, PLLC**

*/s/ Robert Anthony Alvarez Sr.*
Robert Anthony Alvarez (P66954)
Juan Antonio Salazar-Aguero (P86234)
Attorneys for Plaintiff

Dated: November 19, 2026

VERIFICATION

I declare under penalty of perjury that the foregoing is true and correct.

Date: 11/18/2026

/s/ Destiny Worden
Destiny Worden